58 CCPA

**STERLING BREWERS, INC., Appellant,**

v.

**SCHENLEY INDUSTRIES, INC.,**
Appellee.

**Patent Appeal No. 8433.**

United States Court of Customs and Patent Appeals.
May 13, 1971.

Almond, J., dissented and filed opinion.

English translation of "Senorial" is "manorial". *Ibid.*

Joseph A. DeGrandi, Washington, D. C., attorney of record, for appellant. Francis C. Browne, Andrew B. Beveridge, Browne, Beveridge & DeGrandi, Washington, D. C., of counsel.

Milton B. Seasonwein, New York City, for appellee.

Before RICH, ALMOND, BALDWIN and LANE, Judges, and DURFEE, Judge, United States Court of Claims, sitting by designation.

BALDWIN, Judge.

This appeal is from the decision of the Patent Office Trademark Trial and Appeal Board[1] granting appellee's petition to cancel three trademark registrations assigned to appellant, Sterling Brewers, Inc. The registrations are for the mark "COOK'S GOLDBLUME", alone[2] or in association with a design,[3] for beer and ale.

The record shows that appellee, Schenley Industries, Inc., is the owner of a number of registrations for the trademarks "COOK'S" and "COOK'S IMPERIAL" used in association with wine, particularly champagne.[4] The petition

1. The board's opinion is reproduced in full at 157 USPQ 593 (TTAB 1968).

2. Reg. No. 307,387, issued October 24, 1933, pub. under Sec. 12(c) of the Act of 1946 on December 7, 1948, renewed; and Reg. No. 516,183, issued October 11, 1949.

3. Reg. No. 515,055, issued September 13, 1949.

4. Appellee's registrations are identified as Reg. Nos. 28,269, issued May 19, 1896; 44,662, issued July 18, 1905; 52,766, issued May 15, 1906; 398,782, issued November 24, 1942; 504,556, issued

to cancel asserted that the "COOK'S GOLDBLUME" mark had become abandoned. It was further urged that the continued registration of the mark would cause damage to appellee on the ground that its use by appellant in connection with beer would be likely to cause confusion, mistake or deception as to source.

■ At the time the petition to cancel was filed on February 18, 1965, the incontestability provisions of section 15 of the Trademark Act (15 U.S.C. § 1065) applied to the "COOK'S GOLDBLUME" registrations in issue as the result of compliance with the requirements for affidavits in that section and section 8 (15 U.S.C. § 1058). The Trademark Trial and Appeal Board, therefore, correctly noted that it was a prerequisite to appellee's right to have the registration cancelled that a condition specified in section 14(c) (15 U.S.C. § 1064(c)) as permitting the filing of a petition to cancel "at any time" be applicable. See Hy-Cross Hatchery, Inc. v. Osborne, 303 F.2d 947, 49 CCPA 1163 (1962). One such condition, and the one of course relied on by appellant, is that each of the registered marks "has become abandoned."

In a thorough and detailed opinion, the board thereafter reviewed the facts and held that the marks in issue had become abandoned. It further concluded that the concurrent sale of beer and champagne under the marks "COOK'S GOLDBLUME" and "COOK'S" or "COOK'S IMPERIAL", respectively, would be "likely to cause confusion in trade as to source." We will review these holdings in the same order in which they were made by the board.

The record[5] before us establishes that the registrations of "COOK'S GOLDBLUME" were originally obtained by the F. W. Cook Company (hereinafter Cook), which opened a brewery in Evansville, Indiana around 1900 and used "COOK'S GOLDBLUME" as a trademark. For many years prior to 1950, its "COOK'S GOLDBLUME" beer was in competition with the beer of another Evansville brewery, Sterling Brewers, Inc. (appellant's predecessor),[6] in parts of Indiana and several other midwestern and southern states. In 1950, the controlling stock interest in Cook was acquired by one Hulman & Company (hereinafter Hulman), which among other interests, was in the wholesale grocery business. A new brewing house was opened late in 1950 to increase the output of the brewery, which had continued in operation. In 1955, however, a labor dispute arose, culminating in a strike that closed the brewery on June 9, 1955. The strike was never settled and in September of that year, a decision was made that the brewery would not be reopened. As it turned out, the brewery was never again operated on a continuing basis. The mark "COOK'S GOLDBLUME" was also not used again until appellant began marketing beer under that label in early 1964 after acquiring an assignment of the registrations in issue in late 1963.

Throughout the period from 1955 to the time of the assignment to appellant, three employees, including two engineers, were stationed at the brewery for maintenance of the plant and equipment. In the portion of that period prior to 1960, several attempts were made to sell the brewery, representatives of Cook calling by telephone the representatives of other

December 7, 1948; and 504,557, issued December 7, 1948. The first four registrations have been renewed and published under section 12(c) of the Trademark Act of 1946, and all the registrations have acquired incontestable status under section 15 of that act.

5. The record includes depositions of three past or present officials of appellant or its predecessors in interest, and an employee and a former employer of appellee,

all called by appellee. Appellant took the deposition of its president. Among the exhibits are a number of excerpts from an Evansville, Indiana newspaper.

6. Although appellant is a new corporation and a subsidiary of Associated Brewing Company of Detroit, Michigan, no further effort need be made to distinguish between the two Sterling Brewers, Inc. in this opinion.

breweries which there was reason to believe might be interested in expanding. Representatives of some of those breweries inspected the Cook plant from time to time. In 1960, an Evansville resident founded a corporation called Cook Brewery, Inc. to purchase and reopen the brewery and paid thirty thousand dollars for an option. Due to financial difficulties, and perhaps other circumstances, the option was not exercised. During this period, appellant attempted from time to time to buy the rights to the "COOK'S GOLDBLUME" label but was turned down because Cook wanted to sell the assets of the brewery only as a single package.

Cook was dissolved as a corporation as of December 30, 1960, at which time its assets were transferred to Hulman, the largest stockholder. Hulman continued to seek a buyer for all of the assets as a package. In 1962, a group paid one hundred and twenty-five thousand dollars for an option to purchase all the assets of the brewery but that option too was allowed to lapse. During this period, Hulman continued to refuse to consider offers by appellant to buy the rights to the "COOK'S GOLDBLUME" label.

In early 1963, a local civic group, the Central Evansville Improvement Corporation, was formed to develop an area in Evansville which included the brewery property for a major civic and cultural center. Hulman was approached by this group with an offer to purchase the physical assets of the brewery. Although Hulman considered the amount offered to be less than the property was worth, it felt that retention of a proper image in Evansville, where it had other interests, required it to cooperate. In the summer of 1963, members of the civic group met with Hulman representatives and an agreement to sell the physical assets of the brewery was reached. Mr. R. T. Riney, chairman of the board of appellant and a member of the civic group, was in attendance and at that time he offered again to buy the rights to the "COOK'S GOLDBLUME" label. The Hulman representatives agreed. Subsequently, formal agreements with the civic group [7] and appellant were completed, with the trademarks and the present registrations being sold to appellant along with the trade names used by Cook and the good will of the business for seventy-five hundred dollars. With its purchase of the trademarks, appellant also received miscellaneous advertising materials and some labels and crowns. It did not receive any customer lists, beer, bottles or a formula for the beer that had been brewed by Cook.

In undertaking to produce beer under the newly acquired "COOK'S GOLDBLUME" marks, appellant found that there was no actual written formula for Cook's beer in anyone's possession at that time. However, it did attempt to duplicate that beer on the basis of information that was available, and apparently was successful in doing so.

Appellant then test-marketed the new "COOK'S GOLDBLUME" beer in the early part of 1964 in Memphis, Tennessee and Birmingham, Alabama, two of the market areas for the beer formerly produced by Cook, placing newspaper advertisements advising that "COOK'S GOLDBLUME" beer was back on the market. The response to the beer under labels corresponding to the registrations was favorable, and the marketing area was expanded into many of the other states originally served by Cook. Sales of appellant's "COOK'S GOLDBLUME" beer exceeded three hundred thousand dollars in 1964, six hundred and fifty thousand dollars in 1965, and approximately five hundred and fifty thousand dollars in the first nine months of 1966. Advertising expenditures for the product were around thirty-five thousand dollars in 1964 and three thousand dollars in 1965.

---

7. After completion of the agreement with the civic group, the brewery was dismantled and the brewery equipment sold to other parties.

Determination whether these circumstances show that appellant's mark had become abandoned is governed by the statutory definition of abandonment, appearing in section 45 of the Trademark Act of 1946 (15 U.S.C. § 1127). That definition reads:

> Abandonment of mark. A mark shall be deemed to be 'abandoned'—
>
> (a) When its use has been discontinued with intent not to resume. Intent not to resume may be inferred from circumstances. Nonuse for two consecutive years shall be prima facie abandonment.
>
> (b) When any course of conduct of the registrant, including acts of omission as well as commission, causes the mark to lose its significance as an indication of origin.

The board seems to have based its finding of abandonment on part (a) of this definition. It first noted that the non-use of the "COOK'S GOLDBLUME" mark from 1955 through 1963 amounted to prima facie abandonment under the statute. After then considering the facts outlined above, it was concluded that appellant had not overcome this prima facie case. In response to appellant's urgings that the purpose for purchasing the "COOK'S GOLDBLUME" mark was to reap the good will built up in the mark over the years, the board stated:

> While there may be some residual good will in the mark immediately or shortly after the discontinuance thereof, where, as here, there has been no sale or promotion of any product under a mark for approximately nine years, whatever good will resided in the mark must necessarily have been dissipated over the years.

Finally, the board held that, since the mark in question had been abandoned for non-use prior to 1964,

> the assignment thereof to respondent, especially after the physical assets of the brewery had previously been sold to another, was nothing more than a naked assignment of the mark dissociated from any business or accompanying good will of the assignor and from which no derivative rights to the mark could have attached. Hence, it conferred no rights in the mark upon the respondent. (Citation of cases omitted).

Appellant attacks this finding on two grounds. First, it urges that there never was any intention to abandon the trademark rights in the mark and that those rights therefore were properly transferable. It also contends that the board "ignored the reservoir of good will remaining in the mark even after the non-use for several years."

■■ Admittedly, there was non-use of the "COOK'S GOLDBLUME" mark for over two consecutive years. Such non-use constitutes prima facie abandonment under the statute. Appellant has the burden of demonstrating that the circumstances here do not justify an inference of intent not to resume use in order to overcome that prima facie case.

■ A first aspect of the board's determination of abandonment lies in its conclusion that the good will built up in the mark through long years of use had been dissipated during the non-use for over eight years. We do not agree with that conclusion. Appellant was thoroughly familiar with the history of Cook's "GOLDBLUME BEER" as a competing product in the same markets over many years. Being continuously active as a brewer, it was also in a position to evaluate the current conditions of those markets. Its evaluation, as revealed by its willingness to pay a considerable sum for the rights to the mark and the associated good will in 1963, amounts to substantial evidence that the mark still had significance as an indication of origin and a symbol of good will. Even more persuasive evidence to the same effect lies in the substantial sales that appellant's "COOK'S GOLDBLUME" beer enjoyed from its introduction in 1964 in the same markets previously served by Cook despite low advertising expenditures.

We have considered the opinion in Corr v. Oldetyme Distillers, Inc., 118 F.2d 919, 28 CCPA 1057 (1941), cited by the board as holding that memory of the good qualities of a product ("THREE FEATHERS" whiskey) recalled long after the mark and business had been abandoned "does not change the situation" as to previous abandonment. However, as is true with most issues of trademark law, the determination of abandonment is peculiarly dependent on the facts of each particular situation and remarks in prior opinions are of little help. In Corr, the evidence that the mark had been abandoned was highly persuasive, including testimony indicative of the original owners who had retired and closed out their business having wanted the formula for the whiskey and the "brand name" to die with them.

In the present case, the facts point to an entirely different conclusion. The closing of the brewery was the result of a strike and not a voluntary act by Cook. The decision not to reopen, made but three months later when a strike settlement was not attained, was a qualified one, described by Cook's Vice-President as a decision not to reopen "with the intent of operating it [the brewery] under its past methods" so far as labor contract negotiations were concerned. We do not think these actions in the early months of non-use of the mark demonstrate intent to abandon.

The matter of whether the duration of the non-use and the attendant circumstances show legal intent not to resume use is more difficult. Nevertheless, we are satisfied that the facts of record negate the presumption of abandonment that arises from the non-use for more than two consecutive years. The continuous activity of Cook and Hulman directed to maintenance of the brewery during the period of non-use, coupled with the refusal to consider periodic efforts of appellant to negotiate purchase of the rights to the mark separately, demonstrates an intent to maintain conditions conducive to resumption of production under the mark on relatively short notice. There obviously was a continuing specific intent to preserve the capacity to transfer the right and ability to resume production of "COOK'S GOLDBLUME" beer to a purchaser of the brewery assets.

■ In characterizing the assignment by Hulman as a "naked" assignment, the board refers to it as occurring "after the physical assets of the brewery had previously been sold to another." That comment indicates either a misunderstanding of the facts or an incorrect interpretation of their significance. The agreement to sell the rights to the trademarks having originated on the same day as the agreement to part with the physical assets, we think that the sale of the latter is not an indication of abandonment of the former. As to the sales being to different parties, we see no reason why tangible assets must necessarily be included in the assignment of a trademark with the good will of the business associated with it. See Hy-Cross Hatchery, Inc. v. Osborne, supra. For reasons already set forth, the trademarks still symbolized substantial good will and had not already become abandoned. By the assignment to appellant, Hulman relinquished the right to market "COOK'S GOLDBLUME" beer, and appellant promptly began the exercise of that right. Appellant did not acquire a list of Cook's customers, but as a former competitor, it knew who the customers were. Similarly, the fact that no written formula was available is not critical, it being apparent that appellant was able to provide a satisfactory duplication of the qualities of the Cook product from information that was available. We therefore do not agree with the board that the assignment to appellant was ineffective to transfer substantive rights in the registrations in issue.

■ Appellee goes further than the board with respect to the assignments. It argues that the assignment from Cook to Hulman in 1960 was nothing but a "naked" assignment of the mark and that that assignment also constituted an act of abandonment. However, it must

be presumed from the circumstances that the mark retained at least as much significance as a symbol of good will in 1960 as it proved to have in 1963 and later. Also, the earlier assignment additionally included physical assets of the brewery. We are therefore satisfied that the 1960 assignment was valid and effective to transfer the trademark rights to Hulman. The question, implicit in appellee's argument, whether an ineffective assignment of a mark constitutes an act of abandonment is therefore moot.[8]

■ It is also pointed out by appellee that five other trademark registrations of Cook's were cancelled by the Patent Office for failure to file the affidavits required by section 8(a) of the Trademark Act (15 U.S.C. § 1058(a)). We do not regard this as of any significance relative to the involved registrations, particularly since only one of the five, and not all of them as appellee erroneously states, included GOLDBLUME along with COOK'S and that one also included a detailed design which the record does not show was ever used.

■ Appellee finally argues as a distinct proposition that the involved trademark has become abandoned under part (b) of the statutory definition, *supra*. We disagree with that argument because we think, for reasons already fully set out, that the mark did not "lose its significance as an indication of origin."

Since we do not find the record to establish either that the use of the present trademarks was discontinued with intent not to resume or that they lost their significance as an indication of origin, the decision of the board must be reversed.

Reversed.

ALMOND, Judge (dissenting).

I cannot agree that the prima facie case of abandonment that arises from non-use for more than two consecutive years (15 U.S.C. § 1127) has been over-come. The majority concludes that the activity of Cook and Hulman directed to maintenance of the brewery and the refusal for several years to sell the rights to the mark separate from the brewery shows an intent to resume and rebuts the statutory presumption of abandonment. I disagree.

It seems to me that the most the activities of Cook and Hulman during the period from 1955 through 1963 demonstrate is that they, as owners of the brewery, were following sound business judgment in an effort to recover the maximum amount for its sale. For example, the maintenance work on the plant over the years can be explained as due wholly to the realization that more could be realized from the sale of a properly maintained plant than from one that had been allowed to deteriorate. As the record shows, that work did not keep the brewery in condition to be operated competitively since it would have required substantial investment for new bottling equipment, which neither Cook nor Hulman saw fit to make. Similarly, offering the brewery for sale as a package only was clearly a decision based on the recognition of a possibility that a potential purchaser might pay more for the entire assets including the trade name and trademark rights than the tangible and intangible assets would bring separately. That decision very likely involved a sound business risk to protect the more valuable physical assets, but as an indication of an intent to resume use of the "COOK'S GOLDBLUME" trademark, it is too speculative to merit serious consideration. Only the purchaser of the package, unknown and in fact never found could make a decision on the matter of resumption of use, since the record does not show that either Cook or Hulman ever took any action directed toward resuming production of beer themselves. The sales of the options, which were never exercised, clearly add nothing significant on the question of

---

8. But see the *Hy-Cross* case, *supra*, which questions the proposition that an invalid assignment is, ipso facto, an abandonment of a mark.

Cook's or Hulman's intentions with respect to the mark in issue.

Under the circumstances, I agree with the board that the implication of intent not to resume has not been overcome and the prima facie abandonment, arising under the statute from non-use for more than eight years, must stand. The mark had thus become abandoned before the assignment from Hulman to appellant and there were no rights remaining in it to be transferred. Therefore, I would affirm the decision of the board.