**EMMPRESA CUBANA DEL TABACO, d.b.a. Cubatabaco, Plaintiff,**

v.

**CULBRO CORPORATION and General Cigar Co., Inc., Defendants.**

No. 97 Civ. 8399(RWS).

United States District Court, S.D. New York.

March 12, 2003.

See also 213 F.Supp.2d 247.

Rabinowitz, Boudin, Standard, Krinsky & Lieberman, New York City, By Michael Krinsky, David B. Goldstein, Of Counsel, Winston & Strawn, New York City, By Kevin Walsh, Steve Young, of Counsel, for Plaintiff.

Latham & Watkins, New York City, By John J. Kirby, Jr., E. Marcellus Williamson, Alexandra A.E. Shapiro, of Counsel, Morgan & Finnegan, New York City, By Harry C. Marcus, Janet Dore, Of Counsel, for Defendants.

## OPINION

SWEET, District Judge.

Plaintiff Empresa Cubana del Tabaco d/b/a Cubatabaco ("Cubatabaco") has moved (1) to strike the Eighth Affirmative Defense of defendant General Cigar Co. ("General Cigar") pursuant to Rule 12(f) of the Federal Rules of Civil Procedure; (2) to preclude the trial testimony of Marvin Shanken, the editor and publisher of *Cigar Aficionado;* and (3) to preclude the trial testimony of James Clark, president of Straus Tobacconist. General Cigar has cross-moved, in the event that Cubatabaco's motion to strike the Eighth Affirmative Defense is granted, to amend its answer to include a new affirmative defense pursuant to Fed.R.Civ.P. 15(a).

For the following reasons, Cubatabaco's motions are granted, and General Cigar's motion is granted.

### Prior Proceedings

Cubatabaco applied on January 15, 1997 to register the COHIBA mark and filed a Petition for Cancellation of General Cigar's COHIBA registration with the U.S. Patent and Trademark Office (the "PTO"). Cubatabaco commenced this litigation in November 1997, seeking, *inter alia,* cancellation of General Cigar's registration of COHIBA and an injunction against further use of the mark. In its answer, filed December 5, 1997, General Cigar interposed several affirmative defenses, including the Eighth Affirmative Defense, which reads in its entirety: "Upon information and belief, plaintiff has abandoned its alleged mark by failing to enforce it against infringers and/or counterfeiters." Answer, at 10.

Proceedings were stayed in December 1997 pending the outcome of settlement negotiations. Litigation resumed in February 2000. The nearly two years of fact discovery in this case closed in January 2002, more than a year ago. Neither Shanken nor Clark were identified as potential witnesses during that time, despite repeated requests that any unidentified witnesses be identified.

By order dated June 26, 2002, the Court granted in part and denied in part the parties' cross-motions for summary judgment, dismissing General Cigar's equitable defenses of laches, acquiescence and estoppel.

Trial is now scheduled to begin on May 19, 2003.[1]

Cubatabaco filed the motion to strike the Eighth Affirmative Defense and to preclude Shanken's testimony on December 4, 2002. General Cigar filed in opposition on December 20, 2002, and Cubatabaco replied on January 6, 2003. Oral argument was heard on the two motions on January 15, 2003, at which time they were considered fully submitted.

Cubatabaco filed its motion to preclude Clark's testimony on January 30, 2003. That motion was considered fully submitted on February 5, 2003. Because of the similarity of this motion and that seeking to preclude Shanken's testimony, it will be considered with the two prior motions although they were argued earlier.

### Shanken's Potential Testimony

Shanken is the editor and publisher of *Cigar Aficionado,* the leading consumer cigar

---

1. At the time of submission, the trial had been scheduled to commence approximately one month earlier, on April 7, 2003.

magazine since 1992, and the trade publication *Cigar Insider*. Both journals are publications of M. Shanken Communications, Inc. ("Communications"). Shanken has his offices at 387 Park Avenue South, where he is a tenant of General Cigar, which owns the building. General Cigar's corporate headquarters and Communications are located on the same and adjacent floors.

*Cigar Aficionado* has featured prominently in this litigation. Both parties have extensively cited to *Cigar Aficionado* articles and advertisements throughout the discovery period and on summary judgment, and numerous witnesses have been examined on matters concerning the magazine. General Cigar included as part of its summary judgment motion two interviews of a Cubatabaco executive conducted by Shanken.

Communications has already been subject to document subpoenas (by Cubatabaco on June 19, 2000 and General Cigar on July 24, 2000) and Rule 30(b)(6) deposition notices (Cubatabaco on March 8, 2001 and General Cigar on March 22, 2001). Communications produced its Executive Editor, Gordon Mott ("Mott") as its Rule 30(b)(6) witness. Mott was deposed by both parties on April 24, 2001. In lieu of further deposition of Shanken's staff, which had been noticed by Cubatabaco, the parties and Communications entered into a Fact Stipulation on December 21, 2001.

Almost a year later, on December 20, 2002, Shanken was included on General Cigar's witness list. Shanken has not been deposed by the parties. General Cigar intends to call Shanken on the issue of whether Cubatabaco's COHIBA mark was "well-known" in the United States at the time General Cigar first began to use the mark, including an explanation of Shanken's decision to publish an article on the Cuban COHIBA in the premiere issue of *Cigar Aficionado* and why he chose to have two different covers for the United States and Europe editions, as well as on the topics of fame, confusion and related issues.

### Clark's Identification and Potential Testimony

On January 24, 2003, General Cigar served a document styled "Defendants' Rebuttal Deposition Witness List," in which General Cigar listed Clark as a potential witness. In response to a query from Cubatabaco, General Cigar wrote on January 29, 2003 that they "intend to call Mr. Clark after Plaintiff has concluded its case-in-chief. Mr. Clark is expected to testify on topics of fame and confusion and related issues." General Cigar states that Clark was listed in response to Cubatabaco's live witness list, which included the names of two cigar retailers who will likely testify regarding whether the Cuban COHIBA mark was well-known in the United States in 1992 and/or likelihood of confusion. General Cigar expects Clark to address these same topics and related issues.

Prior to this time, Cubatabaco had never heard of Clark. They discovered after his identification that the company of which he is president, Straus Tobacconist, is the fifth oldest tobacco shop in the country, having been founded in 1880, and that Clark is on the board of directors of the Retailer Tobacco Dealers of America ("RTDA").

### Discussion

### I. The Eighth Affirmative Defense

Cubatabaco has moved to strike General Cigar's Eighth Affirmative Defense, grounded in the doctrine of abandonment. In response, General Cigar argues that the Eighth Affirmative Defense involves a different section of the Lanham Act than that discussed by Cubatabaco or that, in the alternative, the answer should be amended to clarify that fact.

### A. The Defense as Pled Should Be Stricken

Rule 12(f) permits a court to "order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."[2] Motions to

---

2. Rule 12(f) also calls for the motion to strike to be filed "within 20 days after the service of the pleading upon the party or upon the court's own initiative at any time." The instant motion is clearly not within the requisite 20 days. However-

er, "the Court's discretion renders the twenty-day rule 'essentially unimportant,'" *Estee Lauder, Inc. v. Fragrance Counter, Inc.*, 189 F.R.D. 269, 271 (S.D.N.Y.1999), as the Court has the

strike affirmative defenses are "generally disfavored," *Simon v. Manufacturers Hanover Trust Co.*, 849 F.Supp. 880, 882 (S.D.N.Y. 1994), and should be denied unless "there is a clear showing that the challenged defense has no bearing on the subject matter and that permitting the defense to stand would prejudice the plaintiff." *Oliner v. McBride's Indus., Inc.*, 106 F.R.D. 14, 17 (S.D.N.Y. 1985); *see also Simon*, 849 F.Supp. at 882 (motion should be denied unless plaintiff proves "to a certainty that [it] would succeed despite any state of the facts which could be proved in support of the defense.").

■ The Lanham Act provides two grounds on which a trademark may become abandoned: (1) when the mark's "use has been discontinued with an intent not to resume such use," and (2) "[w]hen any course of conduct of the owner, including acts of omission as well as commission, causes the mark to become the generic name for the goods or services on or in connection with which it is used or otherwise to lose its significance as a mark." 15 U.S.C. § 1127.

Cubatabaco's initial motion papers focused solely on the second prong of abandonment, § 1127(2). General Cigar claims, however, that its Eighth Affirmative Defense is instead based on § 1127(1). As a result of this admission, to the extent that the Eighth Affirmative Defense pleads an abandonment defense pursuant to § 1127(2), the defense must be stricken.

The Eighth Affirmative Defense states: "Upon information and belief, plaintiff has abandoned its alleged mark by failing to enforce it against infringers and/or counterfeiters." To make out abandonment under § 1127(1), two elements must be pled and proved: (1) non-use and (2) intent not to resume use. *Silverman v. CBS, Inc.*, 870 F.2d 40, 45 (2d Cir.1989). The Eighth Affirmative Defense does not explicitly allege that Cubatabaco's use of the mark has been discontinued or with an intent not to resume such use. Nor does it implicitly do so as the

behavior complained of—failure to enforce its mark against infringers—is insufficient to prove non-use, 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 17:17 at 17–34 (2002) (hereinafter "McCarthy") ("[F]ailure to sue third-party infringers is relevant to 'abandonment' only when the failure causes the mark to lose all trademark significance ...."), and the enforcement of marks is insufficient to prove use. *E.g., Silverman*, 870 F.2d at 47–48 ("[C]hallenging infringing uses is not use ...."). As a result, even construing the pleadings liberally, *Estee Lauder, Inc. v. Fragrance Counter, Inc.*, 189 F.R.D. 269, 271 (S.D.N.Y.1999), the Eighth Affirmative Defense does not state a claim under § 1127(1), but instead does so under § 1127(2), and therefore must be stricken. It is thus necessary to determine whether General Cigar should be permitted to amend its answer to include an affirmative defense based on § 1127(1).

### B. *General Cigar May Amend Its Answer*

General Cigar has sought leave to amend its answer to include the following as its Eighth Affirmative Defense: "Plaintiff abandoned any rights in the COHIBA mark because, for a period exceeding three years, it failed to use or enforce the mark and had no intent to begin using the mark in the reasonably foreseeable future." [3]

Rule 15(a) of the Federal Rules of Civil Procedure provides that the district court should freely grant leave to amend the pleadings. Fed.R.Civ.P. 15(a). The amendment should be permitted absent evidence of circumstances such as undue delay or bad faith, undue prejudice to the opposing party or futility. *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *see also Jones v. New York State Div. of Military and Naval Affairs*, 166 F.3d 45, 50 (2d Cir. 1999) (affirming district court's denial of leave to amend due to futility of amendment).

---

authority to hear a motion to strike at any time after the twenty-day period.

**3.** A comparison of the proposed amended Eighth Affirmative Defense, which essentially tracks

closely § 1127(1), with the originally plead Eighth Affirmative Defense also supports the decision in Part I.A. that the original defense should be stricken as not invoking § 1127(1).

Cubatabaco alleges that the amendment should be denied because of undue delay and prejudice, and because it would be futile.

■ Cubatabaco persuasively points out that had the answer been amended earlier, the proposed new Eighth Affirmative Defense could have been the subject of a summary judgment motion, and that—with two months to go before trial—such briefing now would not be plausible. However, there have been extensive submissions in support of the parties' summary judgment motions, upon which, as discussed below, it can be determined that an issue of fact remains as to the question of whether Cubatabaco intended to use the mark in the United States. Moreover, it is no surprise that General Cigar is claiming abandonment (albeit under § 1127(1) instead of § 1127(2)) and because the facts at issue were discovered and were briefed for the summary judgment motion, the two months that remain until trial will be sufficient to include argument for and against the new defense. Therefore, Cubatabaco has not met its burden of showing prejudice.

The undue delay is explained because General Cigar was only acting in reaction to Cubatabaco's late-breaking motion to strike the existing Eighth Affirmative Defense. In any case, had the pleading remained as it was, General Cigar could have moved under Rule 15(b) to conform the pleading to the evidence presented at trial.

■ With regard to futility, Cubatabaco puts forward several arguments. As an initial matter, Cubatabaco asserts that the doctrine of abandonment under the Lanham Act is inapplicable to a mark that has priority due to the "famous marks" doctrine.[4] While neither side has presented applicable case law, the language of § 1127 suggests that it applies in this situation. In defining abandonment, § 1127 concerns "marks," which are defined, in part, as trademarks. 15 U.S.C. § 1127. Trademarks, in turn, are defined, in part, as "any word, name, symbol, or device, or any combination thereof ... used by a person." *Id.* Section 1127 does not include a definition for "use" although it

does specify what "use in commerce" means. *Id.* Therefore, the ordinary definition of "use" will apply, and that definition does not include any geographical boundaries. Therefore, in the absence of any specification within § 1127 that it should only apply to registered marks, or to marks that are in use in the United States, § 1127 would appear to apply to any mark used anywhere. Thus, a foreign mark that is used worldwide, and by such use gains sufficient fame in the United States to stake a claim on that mark, even in the absence of use or registration in the United States, can be abandoned under § 1127.

■ To hold otherwise would provide any owners of famous marks unregistered in the United States a benefit for not registering their mark, *i.e.,* their mark could not be deemed abandoned under the Lanham Act. Given the policies underlying the Act as discussed at greater length in the summary judgment opinion, *Emmpresa Cubana Del Tabaco v. Culbro Corp.,* 213 F.Supp.2d 247, 281–82 (S.D.N.Y.2002), such a result cannot be tolerated. Therefore, it is held that abandonment, as defined in § 1127, applies to any mark, including marks whose rights are derived under the "famous marks" doctrine.

■ Cubatabaco also challenges whether General Cigar would be able to state a claim for abandonment under § 1127(1). As discussed at greater length in *Emmpresa Cubana,* a determination that a mark has been abandoned defeats the alleged owner's claim of priority. *General Cigar Co. v. G.D.M., Inc.,* 988 F.Supp. 647, 658 (S.D.N.Y.1997) ("*G.D.M.*") (*citing Dial–A–Mattress Operating Corp. v. Mattress Madness,* 841 F.Supp. 1339, 1355 (E.D.N.Y.1994)) (*citing Manhattan Indus., Inc. v. Sweater Bee by Banff Ltd.,* 627 F.2d 628, 630 (2d Cir.1980)). Because it constitutes a forfeiture of a property right, abandonment of a mark must be proven by clear and convincing evidence, and statutory aid to such proof must be narrowly construed. *Saratoga Vichy Spring Co. v.*

---

4. Under the "famous marks," or "well-known marks," doctrine, a party with a well-known mark at the time another party starts to use the

mark has priority over the party using the mark. *See* discussion in *Grupo Gigante S.A. v. Dallo & Co.,* 119 F.Supp.2d 1083, 1089 (C.D.Cal.2000).

*Lehman,* 625 F.2d 1037, 1044 (2d Cir.1980); *see also G.D.M.,* 988 F.Supp. at 658.

▆▆▆▆ The Second Circuit has found two elements necessary to prove abandonment: (1) non-use and (2) intent not to resume use. *Stetson v. Howard D. Wolf & Assoc.,* 955 F.2d 847, 850 (2d Cir.1992) (*citing Silverman,* 870 F.2d at 45). The party claiming abandonment bears the burden of proof as to both elements. However, where the statutory presumption of abandonment has been established by non-use for more than two consecutive years, the trademark owner must demonstrate that circumstances do not justify the inference of an intent not to resume use. *Exxon Corp. v. Humble Exploration Co.,* 695 F.2d 96, 99 (5th Cir.1983).

One means of so rebutting the presumption is to make a showing of excusable non-use similar to that permitted under Section 9(a) of the Lanham Act, 15 U.S.C. § 1059(a). *Jose M. Arechabala Rodrigo v. Havana Rum & Liquors, S.A.,* Cancellation No. 22,881, *slip op.* at 15 (T.T.A.B. Oct. 19, 1995) (*citing American Lava Corp. v. Multronics, Inc.,* 59 C.C.P.A. 1127, 461 F.2d 836, 839, 174 U.S.P.Q. 107 (C.C.P.A.[5] 1972)). If a registrant's use is excusable, the registrant has overcome the presumption that its non-use was coupled with an "intent not to resume use" .... *Imperial Tobacco, Ltd. v. Philip Morris, Inc.,* 899 F.2d 1575, 1581 (Fed.Cir. 1990).

Courts have interpreted § 1127 to find such excusable non-use "where there is a temporary, forced withdrawal from the market due to causes such as war, import problems, or some other involuntary action." *Id.* at 16–18 (*citing* McCarthy, *supra,* § 17.04; *Chandon Champagne Corp. v. San Marino Wine Corp.,* 335 F.2d 531, 535, 142 U.S.P.Q. 239 (2d Cir.1964) ("plaintiff's forced wartime withdrawal from the American market was

not an abandonment of the mark"); *F. Palicio y Compania, S.A. v. Brush & Bloch,* 256 F.Supp. 481, 493, 150 U.S.P.Q. 607, 616 (S.D.N.Y.1966) ("There has been no claim that the former owners have abandoned the trademarks. Nor could such claim prevail."); *Haviland & Co. v. Johann Haviland China Corp.,* 269 F.Supp. 928, 154 U.S.P.Q. 287, 306 (S.D.N.Y.1967); *Cuban Cigar Brands N.V. v. Upmann Int'l, Inc.,* 457 F.Supp. 1090, 1101, 199 U.S.P.Q. 193, 202 (S.D.N.Y.1978) ("the fact that plaintiff was intervened by the Cuban Government and thus prevented from exporting (its goods) to this country until recently does not constitute an abandonment of the mark"); *Menendez v. Faber, Coe & Gregg, Inc.,* 345 F.Supp. 527, 174 U.S.P.Q. 80, 87 (S.D.N.Y.1972) ("Trademark rights are not destroyed by temporary suspension of the business to which they are appurtenant due to causes beyond the control of their owner ....")).

Cubatabaco relies heavily on *Rodrigo,* where the TTAB rejected a claim of abandonment on account of the Cuban Embargo [6] (the "Embargo") and because the respondents used the mark worldwide and intended to use the mark in the United States "as soon as it is legally possible to do so." *Rodrigo, slip op.* at 19. Cubatabaco urges that its situation is similar as it too is constrained from using its mark by the Cuban Embargo and it too uses the mark worldwide. There is one difference between the instant situation and those present in, and cited by, the *Rodrigo* court: Cubatabaco is not a "registrant" of the COHIBA mark in the United States. In cases involving registrants of federal marks who cannot use the marks due to some excusable reason, as detailed above, the intent to use the mark in the United States may be inferred as a matter of law from the fact that they have registered the mark. Because Cubatabaco did not register the COHI-

---

**5.** The Court of Customs and Patent Appeals is the predecessor court to the Court of Appeals for the Federal Circuit.

**6.** The Cuban Assets Control Regulations, 31 C.F.R. Part 515, prohibit, *inter alia,* (1) the importation into the United States of merchandise from Cuba or merchandise of Cuban origin; and (2) the use in U.S. commerce of any trademark in which Cuba or a Cuban national has, at any time

since July 8, 1963, had any interest, direct or indirect. 31 C.F.R. §§ 515.201, 515.204, 515.311. These same regulations allow for, however, filing in the United States applications for trademark registrations, prosecuting said applications, receiving registration certificates and renewal certificates and recording any instrument affecting title to trademark registrations. 31 C.F.R. § 515.527.

BA mark,[7] its intent to use the mark in the United States must be found by other means.

■ Whether Cubatabaco intended to use the mark in the United States when the Embargo was lifted presents a question of fact, weighing the facts that Cubatabaco did not attempt to register its mark or contest the General Cigar COHIBA mark until 1997 with the fact that it could not in any case use the mark in the United States, and with any efforts that it took to maintain its fame in the United States.

■ It also remains a question of fact at what time, if ever, Cubatabaco gained priority rights over COHIBA mark in the United States. In order to prevail against General Cigar, however, it will have to be concluded that those rights were in place, at the latest, as of the fall of 1992, when General Cigar resumed its use of its COHIBA mark. Therefore, even if Cubatabaco had priority rights in 1992, and even though it could not actually use the mark in the United States due to the Embargo, it could nonetheless have abandoned the mark if it did not have an intent to use the mark in the United States for a period of more than the two-year statutory period of presumptive abandonment [8] at any time from the fall of 1992 to January 1997.

If Cubatabaco failed to have such an intent for at least a two-year period from 1992 to 1997, its attempts to revive its interests with its cancellation petition and the instant lawsuit in 1997 will be unavailing, because such situation would be akin to a new and separate use, which does not cure abandonment. For instance, in *Stromgren Supports, Inc. v. Bike Athletic Co.*, 43 U.S.P.Q.2d 1100, 1112, 1997 WL 377630 (T.T.A.B.1997), the owner of the mark had stopped use of the mark in 1987. There was no evidence of intent to resume use after that time until, in 1990, the owner was contacted with regard to whether it was still employing the mark, and it replied that at that time it had plans to resume use in the future. *Id.* The court held that the mark had been abandoned by the requisite period of non-use without intent to resume use such that the intent to resume use in 1990 was insufficient because "these later efforts, had actual use ever commenced, would represent a new and separate use which cannot serve to cure the abandonment." *Id.* (*citing Cerveceria Centroamericana, S.A. v. Cerveceria India, Inc.*, 892 F.2d 1021 (Fed.Cir.1989)).

Because there remains a question of fact with regard to whether Cubatabaco had the intent to use the mark in the United States from the period of at least 1992 to 1997, General Cigar's proposed amended Eighth Affirmative Defense is not futile and will be permitted.

It should be briefly noted that Cubatabaco claims that General Cigar is attempting to re-introduce the equitable defense of laches that was dismissed on summary judgment. The inquiry involved in the issue of abandonment differs from that of laches, however. Here, the question is whether Cubatabaco can show that it had an intent to use the mark in the United States. The issue for laches was whether Cubatabaco "had knowledge of the defendant's use of its marks, that plaintiff inexcusably delayed in taking action with respect thereto, and that defendant will be prejudiced by permitting plaintiff inequitably to assert its rights at this time." *Cuban Cigar Brands*, 457 F.Supp. at 1096. While

---

7. The Embargo did not prevent Cubatabaco from registering its marks, and Cubatabaco was well aware of this rule, as a glance at the Federal Registry and the list of marks owned by Cubatabaco reveals.

8. The statutory period of non-use sufficient to constitute a prima facie case of abandonment was increased from two years to three years by the Uruguay Round Agreements Act, Pub.L. No. 103–465, § 521, 108 Stat. 4809, 4981–82 (1994). The amendment was effective January 1, 1996, and the amendment does not expressly call for retroactive application. Therefore, it would appear that the statute as it was in effect from 1992 to 1996 controls. *Landgraf v. USI Film Products*, 511 U.S. 244, 280, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994); *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988) ("Retroactivity is not favored by law. Thus, congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires the result."); *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 110 S.Ct. 1570, 108 L.Ed.2d 842 ("[W]here the congressional intent is clear, it governs.")

evidence that Cubatabaco delayed in taking action with respect to the General Cigar registration will certainly be material to whether it had an intent to use the mark in the United States, such evidence may or may not be sufficient, and certainly is not required. In addition, the effect of Cubatabaco's action on General Cigar is not of particular import. Therefore, General Cigar is not trying to take another bite at the apple.

## II. *Motion to Strike the Testimony of Shanken and Clark*

Rule 26(a) of the Federal Rules of Civil Procedure requires parties to provide, *inter alia,* "the name . . . of each individual likely to have discoverable information that the disclosing party may use to support its claims or defenses, unless solely for impeachment, identifying the subjects of the information." Fed.R.Civ.P. 26(a)(1)(A). The Advisory Committee Notes make clear that " 'Use' includes any use . . . to support a motion, or at trial." The Notes also make clear that "Subdivision [26](e)(1) . . . requires supplementation if information later acquired would have been subject to the [Rule 26(a)(1) mandatory] disclosure requirement." *See also Fleet Capital Corp. v. Yamaha Motor Corp.,* 2002 WL 31108380, at *1 (S.D.N.Y. Sept.23, 2002).

 It is within the inherent power of the district court to impose sanctions for a violation of Rule 26(e). *Outley v. City of New York,* 837 F.2d 587, (2d Cir.1988). Courts look to four factors in determining whether the testimony of witnesses should be precluded as such a sanction: (1) the party's explanation for failure to comply with the discovery order;[9] (2) the importance of the testimony of the precluded witness; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance. *Id.; see also Reilly v. Natwest Markets Group, Inc.,* 181 F.3d 253, 269 (2d Cir. 1999); *Softel, Inc. v. Dragon Medical and Scientific Comm. Inc.,* 118 F.3d 955, 961 (2d Cir.1997). A finding of bad faith is not re-

quired, and delay resulting from neglect is sufficient for preclusion. *E.g., Wolak v. Spucci,* 217 F.3d 157, 161 (2d Cir.2000).

 As an initial matter, a continuance is not a reasonable possibility. The trial is set for May 19, 2003, a date that was already pushed back a month due to scheduling conflicts in this Court, and a date that is approximately six years after the commencement of this action. Therefore, in analyzing the two motions to strike, the Court must consider the reality that trial will start approximately two months after the issuance of this opinion.

Particularly in light of this timeline, Cubatabaco has also put forward a compelling case for the prejudice that it will suffer should Shanken and Clark be permitted to testify. The prejudice is not limited to the fact that the parties would have to squeeze in two depositions in the two-month period before trial. With regard to Shanken, Cubatabaco states that it would also request, prior to his deposition: (1) full document discovery from Communications and Shanken concerning the research, expertise and editorial considerations that led to prominent attention given the Cuban COHIBA in the premiere issue of *Cigar Aficionado;* (2) to depose James Suckling, the writer who researched and wrote the article on the Cuban COHIBA in the premiere issue and who has been the principle writer on Cuban cigars and the COHIBA since that time; (3) to depose others who were then at *Cigar Aficionado;* (4) to redepose Mott, who conceived of the premiere issue with Shanken and who refused to testify as to editorial decisions on claims of editorial privilege; and (5) to explore fully, through document demands and depositions, Shanken's personal and economic relationship with General Cigar, which is *Cigar Aficionado's* landlord, neighbor and largest advertiser. In addition, in light of the testimony of Shanken, Cubatabaco states that it may wish to seek to depose new fact witnesses of its own, as well as put additional matters to its two experts.

---

**9.** General Cigar argues that it has not violated any discovery orders because it has complied with the Court's orders in terms of deadlines to produce its lists of witnesses and rebuttal witnesses. Such argument ignores its duties under Rules 26(a)(1) and 26(e). *E.g., Morogiannis v. Caesars World, Inc.,* 1995 WL 217512, at *2 (S.D.N.Y. April 11, 1995).

With regard to Clark, Cubatabaco states that it would require in addition to his deposition: (1) document production from Clark and his enterprise prior to the deposition; (2) deposition of Clark's past and present employees, particularly those with direct contact with customers; (3) time to investigate the experience of other tobacconists in Cincinnati and Kentucky, where Clark has stores, and potentially to take their depositions; and (4) to interview and potentially depose other members of the RTDA board of directors. While Cubatabaco likely overstated its case, and not all of the discovery requested above would be granted, it is clear that even the bare minimum of discovery required by fairness would at the very least severely hamper trial preparation and likely could not be completed in the two months before the trial is set to begin.

In addition, General Cigar has failed to put forward a sufficient explanation for its delay in identifying these two witnesses. Certainly General Cigar's apparent reasons for calling Shanken and Clark should have been startlingly clear after the issuance of the June 2002 summary judgment opinion, and there is no logical explanation for why General Cigar took an additional six and seven months, respectively, to identify them as such. Indeed, Cubatabaco has referred to a number of discovery requests suggesting that the issue of the "fame" of the COHIBA in December 1992 has always been at issue.[10]

In light of the above, Clark's testimony should be precluded. General Cigar has failed to put forward any persuasive reasons for why Clark's testimony is so requisite as to ignore the factors above, particularly given the fact that he is meant to be the rebuttal witness to witnesses who were deposed as early as October 2000 and no later than September and October 2001. The motion to strike Clark's testimony is therefore granted.

The issue of Shanken's testimony presents a closer question in this regard. Although Mott is designated to testify, General Cigar claims that Shanken will testify about issues about which Mott does not have personal knowledge and which are not covered by the *Cigar Aficionado* stipulation. General Cigar expects Shanken to testify with regard to his interview of the Cubatabaco executive, in order to show the reliability of his reporting, and with regard to his decision to publish the article on the Cuban COHIBA in the premiere issue of *Cigar Aficionado* as well as his decision to publish two different covers for the European and United States editions. Nonetheless, although this testimony appears slightly more important than Clark's, the factors discussed above, and in particular the weightier prejudice, lead to the conclusion that this testimony must be precluded.

General Cigar has pointed to several cases that it claims support its contention that sanctions should not obtain against it. These cases are, however, distinguishable, as not involving the same level of prejudice or occurring at different stages of the proceedings and involving different facts than those presented here.[11]

**10.** Cubatabaco points to a December 4, 1997 Rule 30(b)(6) deposition notice to Cubatabaco from General Cigar including topics of whether the Cuban COHIBA was well-known in the United States on December 30, 1992 and the reputation of the mark in the United States from 1997 to the present; a February 25, 2000 set of interrogatories from General Cigar seeking identification of persons with knowledge of the U.S. public's awareness of the COHIBA mark as of December 30, 1992; a February 25, 2000 set of document requests requesting documents concerning or supporting Cubatabaco's allegations that the Cuban COHIBA mark was well-known or famous in the United States as of December 30, 1992; a December 15, 2000 opinion, *Cubatabaco v. Culbro Corp.*, 123 F.Supp.2d 203, 204 (S.D.N.Y.2000) (citing to the complaint and its allegations that the Cuban COHIBA was "well-known" in the United States at the appropriate

times); and a March 22, 2001 Rule 30(b)(6) deposition notice to Communications, identifying topics of knowledge of the Cuban COHIBA cigar in the United States prior and subsequent to the premiere issue of *Cigar Aficionado* and the impact of *Cigar Aficionado* on the cigar industry and on consumers and potential customers. Mott, Communications' designated witness, was explicitly asked about the extent to which the Cuban COHIBA was known to cigar smokers in the United States prior to 1992. Defendants have also questioned deponents in more than a dozen depositions regarding the fame and reputation of the Cuban COHIBA.

**11.** The procedural posture in *Fleet Capital*, 2002 WL 31108380, at *2, which was decided at the summary judgment stage, most differentiates it from the instant situation. In addition, the defendant had an agreement to interview the wit-

As Cubatabaco has noted, this case has been an extremely complex, complicated and hard-fought one. Both parties have been represented by able and tenacious counsel. Hundreds of people with potentially relevant information, including present and former employees of the parties, and cigar manufacturers, distributors, retailers, publishers and consumers could have been deposed. Both parties, however, recognized and agreed that the only way to control and delimit discovery was to cross-identify witnesses during the fact discovery period. Their agreement was prescient and appropriate; no doubt at least an additional handful of witnesses potentially could supply important testimony on some issues (and in particular on the issue of whether the Cuban COHIBA was well-known in the fall of 1992). All hard-fought battles must come to an end, however, to avoid unnecessary waste. After six years it is time for this case to be tried.

### Conclusion

For the foregoing reasons, Cubatabaco's motions to strike the Eighth Affirmative Defense and to preclude the Clark and Shanken testimony are granted, and General Cigar's motion to amend its answer to include a new Eighth Affirmative Defense is granted.

It is so ordered.

ness and the testimony, which was presented in an affidavit to the Court, was "largely repetitive" of other fact witnesses. *Id.* Both *Bellinger v. Deere & Co.*, 881 F.Supp. 813, 817 (N.D.N.Y. 1995) and *Outley*, 837 F.2d at 591, involved eyewitnesses to, respectively, a personal injury and police brutality. In both cases, the identity of the eyewitnesses was known to the other party, even if in the first case they were not identified as potential witnesses, *Bellinger*, 881 F.Supp. at 817, and in the latter, their identities were not fully revealed as the plaintiff failed to include their addresses on an initial disclosure and failed to supplement the disclosure once the addresses were located. *Outley*, 837 F.2d at 591. Here,

Shanken and Clark are just two of many fact witnesses who may testify on the issue of the fame of the Cuban COHIBA mark in 1992, rather than integral witnesses, such as eyewitnesses to an injury. Finally, *Dunlap–McCuller v. Riese Org.*, 980 F.2d 153, 158 (2d Cir.1992) is completely different, as it involves the telephonic depositions of two witnesses during trial, whose depositions were later read into the record solely for the purposes of impeachment and thus fall outside the scope of Rule 26(a). In addition, the Court had little sympathy for the plaintiff, whose own bad act—perjury—necessitated the tardy depositions.